## EXHIBIT A

## AFFIDAVIT OF AGENT JOHN M. GRELLA

I, John M. Grella, being duly sworn, depose and state:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1996.  I am currently assigned to the DEA Boston Financial Investigations Team in Boston, Massachusetts.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

2.      During the course of my employment with the DEA, I have received specialized training regarding the activities of narcotics traffickers, including their use of various communication devices such as cell phones, computers, and Internet and e-mail accounts. I have also received training regarding the methods used by narcotics traffickers to conceal and launder narcotics proceeds and I have been involved with the investigation of various types of money laundering techniques including bulk cash smuggling and the utilization of shell and front companies by drug trafficking organizations.  Based on my training and experience, I am also familiar with the various methods in which narcotics traffickers operating outside the United States launder their drug proceeds internationally.

3.      In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers.  Since joining the DEA, I have participated in more than 175 investigations involving domestic and international drug trafficking organizations as a case

agent and in a subsidiary role.  I have participated in investigations involving multiple domestic and international jurisdictions including Massachusetts, New York, Florida, Colombia, Bahamas, and Canada.

4.      I have debriefed more than 100 defendants, informants, and witnesses who had personal knowledge about domestic and international narcotics trafficking and money laundering activities.

5.      I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and conducting court-authorized interceptions of wire and electronic communications.

6.      As a Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of criminal laws of the United States and thereby authorized to request the issuance of federal search and seizure warrants.

7.      This affidavit is submitted in support of a Verified Complaint for Forfeiture in Rem for the following property:

     a.    $50,900 in United States currency of IBC Bank Cashier's check #162263996 in the amount of $250,910 in United States currency, seized on May 27, 2015, from Insured Aircraft Title Services, Inc., located in Oklahoma City, Oklahoma (the "Defendant Currency").

8.      The information contained in this affidavit is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law enforcement officials, and my review of records, documents, and other physical evidence obtained during this investigation.  This affidavit is being submitted for the limited purpose of establishing probable cause to seize the Subject Property.  I have thus set forth only the facts that

2

I believe are needed to establish the requisite probable cause for the seizure warrant.

9.      As set forth more fully below, there is probable cause to believe that:  (i) the Subject Property is subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. § 853(a)(1) and (2), and § 881(a)(6) because it is money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846; and (ii) the Subject Property constitutes property involved in money laundering transactions in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957, or property traceable to such property, and therefore is subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

Background and Summary of Investigation

10.     Since July 2014, I have been assigned to DEA Attorney General Exempted Operation Mercury ("Operation Mercury").  Among other things, this investigation has targeted the money launderers, businesses, and drug traffickers who import drugs into the United States and utilize the Black Market Peso Exchange ("BMPE") to funnel drug proceeds to Colombia.

11.     During the course of Operation Mercury, DEA has conducted several undercover money pick-ups across the world and has "laundered" millions of dollars on their behalf.  A money pick-up is an undercover operation in which a DEA undercover agent, after negotiating with a Colombia-based money broker regarding the pick-up location, amount to be picked up, fee for conducting the transaction, and other transaction specifics, picks up money from a money courier sent on behalf of the Colombia-based money broker.  The funds from the pick-up are then

deposited into a DEA undercover bank account and then wired to bank accounts as instructed by the Colombian money broker.  As part of Operation Mercury, the DEA set up undercover bank accounts in Massachusetts to deposit the proceeds from the money pick-ups and to wire the drug proceeds to other bank accounts both inside and outside the United States upon the receipt of instructions from the brokers.

The Black Market Peso Exchange

14.     Narcotics traffickers in Colombia, Venezuela, Mexico, and other countries from which narcotics are grown, processed, or transported to the United States (collectively "Countries of Origin") generate billions of dollars of cash narcotics proceeds in the United States and elsewhere.  To profit effectively from their illegal activities, narcotics traffickers must find a way to "launder" these vast sums of cash, that is, to have the funds transferred to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

13.     Banking laws in the United States, Europe, and Mexico, among other locations, prevent narcotics traffickers from simply depositing drug monies into accounts in the United States and transferring them to Colombia or other countries.  As a result, narcotics traffickers must disguise, or "launder," the funds in order to hide their true source and enable them to be repatriated back to Countries of Origin undetected.

14.     The Black Market Peso Exchange ("BMPE") is one of the primary methods used by narcotics traffickers to launder their narcotics proceeds.  The basic BMPE scheme typically operates as follows.  In Countries of Origin, a narcotics trafficker owning narcotics proceeds generated in the United States or Europe contacts a third party – generally referred to as a "peso

broker" – who agrees to exchange domestic currency he controls in Countries of Origin, e.g., Colombian Pesos, Venezuelan Bolivars, or Mexican Pesos, for the cash narcotics proceeds outside of the Countries of Origin, e.g., in dollars in the case of the United States.  Once this exchange occurs, the narcotics trafficker, having received domestic currency from the peso broker, effectively has laundered his money and is out of the BMPE process.  The peso broker, on the other hand, must now do something with the drug dollars that he has acquired in the United States and elsewhere so that he can obtain more currency and begin the BMPE process again.

15.     To do so, the peso broker uses contacts in the United States and elsewhere to receive the drug proceeds that the peso broker has purchased, often arranging for criminal associates to receive the drug proceeds in suitcases or bags from the narcotics trafficker's operatives who control the money.  After the money is physically transferred, the peso broker uses contacts in the United States to get the drug proceeds into the "legitimate" banking or commercial systems.  With respect to money laundering through the banking system, funds may be deposited into accounts that appear legitimate but are in fact used as vehicles to transmit narcotics proceeds to Countries of Origin.  With respect to money laundering through the commercial system, this is often done through purchases of "legitimate" commercial products using the narcotics proceeds.  The peso broker, still operating in the Country of Origin, now has a pool of narcotics-derived proceeds in the United States or elsewhere, in the form of "legitimate" goods, to sell to individuals or companies in the Country of Origin.  The peso broker then can arrange for the products to be shipped down to the Country of Origin and sold to individuals or companies who wish to purchase products with United States dollars at a favorable exchange rate

and in a manner that avoids United States and other currency exchange and income reporting requirements.

16.    On April 8, 2015, at approximately 6:35 p.m., a DEA undercover agent (hereinafter, "UCA") received a text message in Spanish from a Colombia-based money broker (hereinafter, "broker") using phone number (304) 367-8457, which the broker previously had used in communicating with the UCA.  In the text message, the broker asked if the UCA was willing to pick up approximately $300,000 in Boston.  This initial communication led to a series of short text messages in which the UCA sent the broker a local UCA undercover telephone number for user by the money courier, a photograph of the serial number from a one dollar bill, and the code phrase "looking for Alex on behalf of El Viejo" for the broker to forward to his Boston-based money courier.  The broker also instructed the UCA to let him know when he was contacted by the courier.  Based on my experience, a one dollar bill serial number may be used during meetings as a code to verify the identities of the parties involved.

17.    On April 9, 2015, at approximately 12:27 p.m., the UCA received a telephone call on the number that the UCA provided the previously day by text message to the broker from telephone number (617) 987-7377, but the call got disconnected.  The UCA called the number back and spoke in Spanish with an unknown male, later identified as Juan Peguero (hereinafter, "Peguero").  At the outset of the call, which was recorded[1], the UCA asked Peguero if he was calling the UCA.  Peguero said "Viejo" and the UCA said "yes, Alex" to acknowledge the previously-noted code.  The UCA asked Peguero if he was ready to conduct the money drop and

---

[1] Unless indicated otherwise, all calls and text messages referred to herein were conducted in Spanish and recorded.

stated that he would be ready around 6:00 p.m.  Peguero told the UCA that he had to travel

somewhere before he would be ready.  The UCA told Peguero that 6:00 p.m. would be too late and

they agreed to talk later in the day.  During a follow up call that same day, Peguero again told the

UCA that he had several things to do, so they agreed to conduct the money drop on the following

day.

18.     On April 10, 2015, at approximately 9:14 a.m., the UCA called Peguero and they

agreed to conduct the transaction around 11:00 a.m.  During the call, Peguero told the UCA he

was in the area of Jamaica Plain and the UCA asked Peguero if he wanted to meet at the South

Bay shopping plaza. Peguero told the UCA that the South Bay was "hot" (referring to law

enforcement operating in the area) and stated that he would call back around 10:30 a.m. to come

up with an area to meet.

19.     At approximately 9:24 a.m., the UCA called Peguero and asked him how much

he had, and Peguero responded "410" (referring to $410,000).  The UCA also asked Peguero if

he was familiar with the Stop and Shop at 301 Centre Street in Jamaica Plain, and Peguero

responded, "I don't like any of those places, man."  The UCA asked Peguero where he wanted to

meet, and he said he would let him know in another call.

20.     At approximately 10:53 a.m., the UCA received a telephone call from Peguero,

who asked the UCA if was in the area of Jamaica Plain.  The UCA told Peguero he was not

because the UCA was waiting for Peguero's phone call.  Peguero told the UCA to meet at the

Stop and Shop that was mentioned earlier.  The UCA told Peguero that he could take the UCA's

car when they met in order to load the money, and Peguero said that was fine.  At approximately

11:25 a.m., the UCA received a text message from Peguero identifying 5 Gayhead Street,

Jamaica Plain, as the meet location. The UCA replied back and said it was "ok." It should be noted that Gayhead Street is two blocks west of the Stop and Shop.

21.     At approximately 11:47 a.m., the UCA called Peguero and told him he wanted to keep the original plan and meet at the Stop and Shop and would give him the UCA's car and Peguero agreed.

22.     At approximately 11:59 a.m., the UCA who had been communicating with Peguero, together with a second UCA (together, the "UCAs"), arrived in the UCA vehicle and parked in the Stop and Shop parking lot. At approximately 11:59 a.m., the UCA called Peguero and told him that he was at the Stop and Shop. Peguero told the UCA he would be at the Stop and Shop in one minute. At approximately 12:00 p.m., both UCAs observed Peguero, walking around the Stop and Shop parking lot. Shortly thereafter, the UCA received a phone call from Peguero asking where the UCA was located. The UCA told Peguero he was inside the parking lot and was exiting the car so Peguero could see him. The UCA remained on the phone until Peguero met with the UCA at the UCA vehicle. The second UCA exited the UCA vehicle and both greeted Peguero.

23.     The UCA told Peguero to take the car and bring it back to the parking lot after he was done (referring to placing the money into the UCA's car). Peguero wanted the UCA to follow him to Gayhead Street but the UCA refused (for safety reasons). Peguero told the UCAs that the area was "hot" (referring to law enforcement operating in the area). The UCA told Peguero to take the car and said they would wait inside the Stop and Shop until he returned. The UCA told Peguero to call him when he returned to the parking lot. Peguero said that was fine and then entered the UCA vehicle and drove from the parking lot.

8

24.     At approximately 12:08 p.m., a surveillance agent observed the UCA vehicle pull onto Gayhead Street and park on the right side of the street behind a gray 2008 Honda Accord. The agent saw Peguero exit the UCA vehicle and walk to the Honda and open the trunk.  The agent observed Peguero remove a bag and then walk back to the UCA vehicle and placed it into the trunk.  The agent then watched the UCA vehicle drive onto Centre Street towards the Stop and Shop. Motor vehicle records indicate that the 2008 Honda is registered to Juan F. Peguero at 17 Van Winkle Street, Apt. 1, Dorchester, Massachusetts.

25.     At approximately 12:13 p.m., the UCA received a telephone call from Peguero, who indicated he was at the Stop and Shop parking lot.  Shortly thereafter, the UCAs exited the Stop and Shop and saw Peguero walking towards them.  The UCA asked Peguero where the undercover vehicle was located, and Peguero pointed to the left side of the Stop and Shop parking lot.  The UCA asked Peguero how much "it" (referring to the money) was, and Peguero stated "410" (referring to $410,000).  Peguero then showed the UCA the photo of the one dollar bill serial code that was provided to the broker.  The UCA told Peguero everything was fine.  The UCAs walked to the undercover vehicle, opened the trunk, and observed a brown travel bag that contained the money.  The UCAs then entered the UCA vehicle and drove from the area.

26.     The UCAs traveled to the DEA Boston Field Division and processed the money with additional DEA personnel.  The brown travel bag contained $398,820 in United States currency.

27.     On April 13, 2015, the UCA sent the broker a text message and told him that the final count was $398,820.  The UCA asked the broker for bank accounts in order to "move"

(referring to laundering the money and completing the transaction).  The broker ultimately

provided the UCA with twelve bank accounts in order to complete the transactions.  In

particular, among other instructions, the broker instructed the UCA to transfer $50,045 to the

Subject Property Account at the International Bank of Commerce, account number 717213717.

The broker identified the account holder as Insured Aircraft Title Service.  Based on a request by

the UCA for the tail number, the broker also provided tail number N689JE.  According to public

source databases and information obtained from Insured Aircraft Title Service, N689JE is the

registration number for a Gulfstream II aircraft.

28.     Initially, the $398,820 in United States currency was deposited into a DEA

undercover account in Massachusetts.  Thereafter, on April 29, 2015, in accordance with the

broker's instructions to the UCA, one wire transfer of $50,045 was sent from the DEA

undercover account to the Subject Property Account.  A few days later, the broker asked if

the UCA could retrieve the wire transfer because the money was needed in another account.

On May 6, 2015, the UCA initiated a recall of the wire and the funds were returned to the

DEA undercover account.  A few days later, the broker asked the UCA to re-send the wire

back to the Subject Property Account, but the UCA refused saying that it would look

suspicious.

29.     On May 12, 2015, the broker instructed the UCA to send the $50,045 to

the American Initiative Corporation, Bank of America, account number 229050858481.

On May 13, 2015, a wire of $50,045 was sent from the DEA undercover account to the

American Initiative Account.

30.     Two days later, on May 14, 2015, the Subject Property Account at the

International Bank of Commerce, account number 717213717, received a wire transfer in the

amount of $50,045 (an amount identical to the wire transfer from the UCA account) from American Initiative Corporation, 1420 NE 33 Avenue, Unit 103, Homestead, Florida, via Bank of America.  Information received from Insured Aircraft Title Service in response to an administrative subpoena reflects that this transaction was associated with N689JE.  Based on my training and experience, I believe that this wire transfer of $50,045 from Bank of America to International Bank of Commerce relates to the purchase of the Gulfstream II aircraft with tail number N689JE and that this wire transfer was funded from the same source.  Specifically, I believe that, upon receipt of the wire transfer of $50,045 sent from the UCA account to the American Initiative Corporation, Bank of America, account number 229050858481, these funds were re-wired to the International Bank of Commerce.  Although the account number into which the $50,045 was deposited at the International Bank of Commerce is not available, I believe that the reference number N689JE confirms that it relates to the purchase of the same Gulfstream II aircraft, particularly in light of the fact that this account was the original destination of the wire transfer from the DEA undercover account based on the instructions of the broker.

31.    Based on my experience, the purchase and/or sale of an aircraft, such as the Gulfstream II aircraft with tail number N689JE, often involves the use of escrow services and title and document recordation services.  Insured Aircraft Title Service, which is based in Oklahoma City, Oklahoma, provides such services.  On May 5, 2015, I served Insured Aircraft Title Service with an Administrative Subpoena for records associated with N689JE.  Based on information received in response to this subpoena, I learned that N689JE is being sold for approximately $250,000.

32.     I have learned that Insured Aircraft Title Service has received four (4) wire

transfers totaling $250,910 for the purchase of N68JE, all of which were deposited into

International Bank of Commerce account number 717213717, held in the name of "Insured

Aircraft Title Service." The wires are as follows:

    a) April 25, 2015 – $8,900 from Luis G. Saldana Grillo, Av Intervecinal Ruta 6
       QTA, Caracas, Venezuela via Mercantil Commercebank, Coral Gables, FL;

    b) May 14, 2015 - $149,965 from Krause Ventures LTD, Chambers Wickhams
       Cay, Tortola, British Virgin Islands via Credicorp Bank, Panama City,
       Panama;

    c) May 14, 2015 - $42,000 from PeeBee Corporation, 20100 West Country Club
       Drive, Apartment 906, Aventura, FL via Bank of America; and

    d) May 14, 2015 - $50,045 from American Initiative Corporation, 1420 NE 33
       Avenue, Unit 103, Homestead, FL via Bank of America.

On May 26, 2015, I confirmed with a representative of Insured Aircraft that Insured Aircraft is

presently in possession of $250,910 relating to tail number N689JE and that these funds remain

on deposit at International Bank of Commerce, account number 717213717, which is an escrow

account held by Insured Aircraft that includes commingled funds relating to other transactions for

which Insured Aircraft serves as escrow agent.

33.     Based on my training and experience, together with conversations I have had

with individuals involved in the sale of commercial aircraft, including aviation escrow

officers/managers, criminal investigators, and other persons associated with the sale and

purchase of aircraft, I am aware that legitimate aircraft purchasers typically use the services of an

aircraft broker, who uses the services of an aircraft escrow and title service to facilitate the sale.

Although the receipt of four wire transfers toward the purchase price of an aircraft is not entirely

unusual, this manner of transaction typically is associated with a purchase price over $1 million.

In contrast, in this instance, given the sales price of approximately $250,000 for the aircraft, it is unusual for four wire transfers to be posted.  In addition, if an aircraft is to be exported to a foreign country upon the transfer of title, the purchaser typically hails from the country where the purchase funds originated.  In this case, the purchase funds originated from three different countries -- Venezuela, the British Virgin Islands, and the United States – which is fairly unusual.

34.     Moreover, the purchaser of the subject aircraft remains unknown to Insured Aircraft Title Service, which, again, is unusual.  Although Insured Aircraft has requested information regarding the identity of the purchaser of the aircraft, this information has not been provided.  In response to an administrative subpoena, Insured Aircraft Title Service produced e- mail communications with an individual who claims to be the purchasing representative for the transaction, Luis Saldana ("Saldana") of Venezuela.  On April 27, 2015, Saldana sent an e-mail to an agent of Insured Aircraft Title Service, which stated: "I represent the buyer in this deal."  The e-mail then stated:  "I sent this wire last Friday" (referring to April 24, 2015).  On May 4, 2015, an escrow agent with Insured Aircraft responded to Saldana: "[T]he below email states you represent the buyer in this transaction.  However, the $8,900.00 deposit was sent from you.  Please confirm the buyer's information and if the funds you sent are on their behalf."  Eleven days later, on May 15, 2015, Saldana responded:  "I was busy flying in South America, yes I represent the buyer and the funds that I sent are in they [sic] behalf, she sent some more money for this aircraft $42,000.00 so it should be a total of $50,900.  The company name is Inversiones Air Plus 2006 CA ("Inversiones Air")."  The e-mail also provided an address for Inversiones Air in Caracas, Venezuela.  As reflected above, two wire transfers

were received by Insured Aircraft Title Service on April 25th and May 14th for $8,900 and $42,000, respectively.  These wire transfers were received from Saldana and PeeBee Corporation and not from Inversiones Air. Additionally, the two other wire transfers received by Insured Aircraft Title Service for the aircraft were sent from the American Initiative Corporation and Krause Ventures LTD and not from Inversiones Air.

35.     I have reviewed the articles of incorporation for Inversiones Air and the Venezuelan cedula cards (similar to social security cards) that were submitted to Insured Aircraft Title Service by Saldana in support of the purchase of N689JE.  The articles of incorporation for Inversiones Air list Zaida Leonor Pena Sanchez, with Venezuelan cedula number V-8.764.197, as a corporate officer who holds the title of Director Gerente (Managing Director).  Zaida Leonor Pena Sanchez's cedula card shows a date of birth of 11-30-2000, which would make her 14 years old.

36.     I have conducted several database queries on Saldana and noted on his LinkedIn profile that he is listed as the Chief Pilot for the Avioquattro Airlines Corporation from August 2011 to the present.  I reviewed a Federal Aviation Administration ("FAA") Airmen Inquiry and observed that Saldana has held a Commercial Pilot Certificate since December 1981.  I also noted on a wire confirmation sheet that Saldana uses the name Luis G. Saldana Grillo.  I reviewed an article in the Aviation Business Gazette that was published on May 20, 2015 and entitled, "FAA recognizes Luis Saldana Grillo."  The article shows that Saldana was included in the FAA Airmen Certificate Database and lists his address as 7884 NW 46 Street, Doral, Florida. I reviewed a Florida Division of Corporations report of Avioquattro Airlines Corporation and observed the principal address and mailing address was listed as 7884 NW 46

Street, Doral, Florida.  In addition, the Registered Agent and President of Avioquattro is listed as Yobet Henriquez ("Henriquez").

37.     A records check with the Florida Secretary of State, Division of Corporations, revealed that this address (7884 NW 46th Street, Doral, Florida) is the home of several different businesses in Henriquez's name. These businesses include:

- BYT Computer Solutions LLC;
- Y.B.T. Computer Inc.;
- AVIOQUATTRO Airlines Corp;
- Global Flying Inc.; and
- K-FEINA Corp.

It is noteworthy that, according to the Florida Sunbiz Database, Global Flying Inc. and K-FEINA Corp. were established on the same date, May 3, 2011.

38.     Based on my review of a DEA Report of Investigation, I have learned that Henriquez previously was the subject of law enforcement activity.  In September 2012, Miami-based DEA agents initiated a money laundering investigation involving the BMPE and several suspicious aircraft transactions.  In connection with that investigation, on September 13, 2012, agents interviewed Henriquez, a Venezuelan national, at his business address.  During the interview, Henriquez, and his employee Tamara Bebia, reported to agents that he was in the computer business and sold computers to Venezuela.  Agents asked for more detail on the business, and Bebia said the true nature of the business was the "black market bolivar exchange." She stated that exchanging dollars in Venezuela was difficult and that Venezuela does not allow citizens to exchange bolivars for U.S. dollars.  Agents stated that it was illegal to exchange bolivars for U.S. dollars and they did not respond.  They then admitted to using the profits from the currency exchange business to purchase three aircraft that were the subject of suspicious transactions.

Henriquez and Bebia were asked if they were licensed for banking or currency/money exchange and they told agents they were not.  As a result of this investigation, DEA seized tail number N518WA, a 1978 Israel Aircraft Industries, twin engine jet airplane and its log books at Fort Lauderdale Executive Airport that same day.

39.     As noted above, on May 13, 2015, based on instructions received from the broker, the UCA sent $50,045 to the American Initiative Corporation, Bank of America, account number 229050858481.  A record check with the Florida Secretary of State, Division of Corporations, on the American Initiative Corporation revealed a listed address of 1420 NE 33 Avenue, Unit 103, Homestead, Florida.  The Registered Agent and President is listed as Alberto Pimentel of the same address.  A query with the Miami-Dade Property Appraiser revealed that this property is owned by Guglielmo A. Giuca.  On May 20, 2015, a DEA Agent in Miami checked the aforementioned address and noted that it was a condominium in a residential complex.  The front door of the property indicated no signs of business activity.  The American Initiative Corporation also listed a mailing address of 8005 W 6 Avenue # A, Hialeah, Florida.  I noted that a second corporate officer, Antonio Rios, with the title "PD" is affiliated with this business address.  On May 20, 2015, a DEA Agent in Miami checked the aforementioned address and noted that it was an apartment complex.  The door to apartment A indicated no signs of business activity.  A 1998 Ford Explorer was observed in a parking space registered to the aforementioned address under the name Lucila Hernandez Alvarez.

40.     As noted above, on May 14, 2015, the Target Subject Account received $42,000 from PeeBee Corporation via Bank of America.  I reviewed a Florida Division of Corporations report of PeeBee Corporation and observed a listed principal address and mailing address of 20100 W Country Club Drive, Apartment 906, Aventura, FL.  The Registered

16

Agent and President is listed as Benjamin J. Polat.  Other than the one wire transfer identified above, I was unable to find any links between the PeeBee Corporation or Mr. Polat and the purchase of N689JE.

41.     Finally, as noted above, on May 14, 2015, the Target Subject Account received $149,965 from Krause Ventures LTD, Chambers Wickhams Cay, Tortola, British Virgin Islands via Credicorp Bank, Panama City, Panama.  I ran multiple open source queries on Krause Ventures LTD of the British Virgin Islands (BVI) and was unable to locate an associated website or information about the business.  I reviewed a United States Department of State Bureau of International Narcotics and Law Enforcement Affairs 2014 International Narcotics Control Strategy Report ("INCSR"), which lists the BVI as a Country of Primary Concern due to the exploitation of its offshore financial services and the unique share structure that does not require a statement of authorized capital and the lack of mandatory filing of ownership information, which makes it a significant risk with respect to money laundering. The BVI's proximity to the U.S. Virgin Islands and the use of the U.S. dollar for its currency pose additional risk factors for money laundering. The BVI is a major target for drug traffickers, who use the area as a gateway to the United States.  Other than one wire transfer identified above, I was unable to find any links between Krause Ventures LTD and the purchase of N689JE.

42.     Generally speaking, the funds used for the purchase of an aircraft will be in the form of one large wire with perhaps one, smaller, supplemental wire.  In this case, because of the low selling price, it is unusual for the transaction to be funded by four wires.  As set forth above, the analysis of the aforementioned accounts does not appear to show any links between the four originators of the wires in Venezuela, the British Virgin Islands, and the United States.

17

Confidential Source Information

43.    On May 20, 2015, I spoke with DEA Special Agents in Miami who obtained

information relevant to the purchase/sale of N689JE from two Confidential Sources.

Confidential Source 1 (CS-1) is an aircraft broker based in Florida and holds legitimate

employment relating to the transfer of aircraft.  CS-1 has no criminal history and is believed to

be reliable, because information received from CS-1 previously has led to aircraft seizures.  I

believe that CS-1 previously has been paid for information.  On or about May 18, 2015, CS-1

contacted a Miami-based DEA agent and reported that CS-1 believed that the sale of N689JE

was suspicious.  CS-1 told the agent that the U.S. Airworthy Certificate on N689JE will expire

in June 2015, at which time it will require service on its engines to make it airworthy.  CS-1

also reported to the agent that CS-1 estimates the cost of the engine overhaul to be

approximately $500,000.  CS-1 reported that N689JE likely would be salvaged for parts if it is

not sold prior to the expiration of its Airworthiness Certificate.  Based on my experience, I

understand that, upon expiration of the Airworthiness Certificate, the subject aircraft cannot be

flown into or out of the United States.

44.    Confidential Source 2 (CS-2) is an aircraft broker.  CS-2 has no criminal history

and is believed to be reliable, because CS-2 has provided information to federal law

enforcement on a fairly regular basis relating to other criminal targets that has been corroborated

and because information received from CS-2 previously has led to aircraft seizures.  In late-

April 2015, CS-2 contacted a Miami-based DEA agent and reported that N689JE was going to

be purchased for the purpose of trafficking narcotics.  CS-2 told the agent that the aircraft was

going to be registered in the name of a female.

18

45.     Based on my knowledge, training and experience, I know that aircraft such as N689JE are well-suited for the transportation of narcotics.  N689JE can easily accommodate 1,500 to 2,000 kilograms of cocaine on a single flight.  The prices for a maintained Gulfstream II aircraft such as N689JE can range from $800,000 to $2,000.000.  The Gulfstream II is an older and less efficient aircraft and, in this case, the selling price of N689JE makes it especially appealing for purchase and use in narcotics trafficking in South American, Central America, and Africa.  Traffickers routinely purchase aircraft such as N689JE for use in the transportation of narcotics and will either park or destroy the aircraft after a single use.

Conclusion

46.     Based upon the information set forth above, I have probable cause to believe that the Defendant Currency is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents Currency that was derived through the illegal distribution of narcotics.  Accordingly, I have probable cause to believe that the Subject Currency constitutes property traceable to money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846, and accordingly are forfeitable to the United States pursuant to 21 U.S.C. § 853(a)(1) and (2), and § 881(a)(6).

47.     I further have probable cause to believe that the Subject Currency was a financial transaction involving the proceeds of narcotics offenses, which are specified unlawful activities as defined in 18 U.S.C. § 1956(c)(7)(A) (incorporating by reference 18 U.S.C. § 1961(1)), and

that the transactions were conducted for the purpose of concealing or disguising the nature, location, source, ownership, or control of such proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  In addition, there is probable cause to believe that the Subject Property constituted a monetary transaction involving over $10,000 in proceeds of specified unlawful activity (*i.e.,* drug proceeds) in violation of 18 U.S.C. § 1957.  Accordingly, the Subject Currency is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

Signed under the pain and penalties of perjury, this 11th day of December 2015.

John M. Grella, Special Agent
U. S. Drug Enforcement Administration